*1411 HATCHETT, Circuit Judge:
In this habeas corpus case arising from murder convictions in the Florida state courts, we affirm the district court’s denial of relief because the appellant’s confession was properly admitted into evidence.
FACTS
On November 8, 1983, the Fort Lauder-dale, Florida, Police Department discovered the dead bodies of Susan Hamwi and her infant daughter Shane. The medical examiner estimated that Susan died approximately four to five days prior to November 8th from a single stab wound to her heart. Susan’s body showed signs of strangulation, and other evidence including red hairs found on her undergarments indicated that she had been raped. The medical examiner determined that Shane Hamwi died from dehydration one to two days prior to November 8th.
The Fort Lauderdale Police Department had four suspects, including the appellant, John Purvis. Purvis’s only links to the crime were that he lived two to three houses away from Susan, he had been seen on occasions talking with her, and he is a redhead.
On November 9, 1983, Detectives Martin and Rice went to Purvis’s home and received permission to search it. Purvis’s mother, however, refused to have her room searched. At Purvis’s home, the detectives found no physical evidence linking Purvis to the Hamwi deaths.
Following the search, at the detectives’s request, Purvis and his mother accompanied them to the police station. While at the police station, the detectives separated Purvis from his mother by placing him in an interrogation room pending questioning. At the beginning of the interview, the detectives read Purvis his Miranda rights and took a tape-recorded statement in which Purvis consistently denied killing Susan and causing the death of Shane.
During the interrogation, the detectives learned of Purvis’s history of psychiatric treatment for chronic schizophrenia, his eight to ten-year-old mentality, and his dependence on his mother. Several times, Purvis asked the detectives if he could leave the interrogation room. At one point, a detective pushed Purvis into a chair and told him that the police were going to put him in the electric chair. Pur-vis’s mother saw the detective’s action and immediately took Purvis from the police station. Purvis’s mother then hired a lawyer who advised her not to speak to the police and not to allow Purvis to speak to the police without the lawyer being present.
Subsequently, Detectives Martin and Rice contacted Dr. Klass, a psychiatrist, to help with the investigation. After discussing Purvis’s interrogation on November 9th with the detectives, Dr. Klass commented that the detectives could get more information from Purvis if they questioned him alone. Accordingly, the detectives sought to discover Purvis’s schedule in hopes of finding him alone. Upon learning of Pur-vis’s weekly visit to a drugstore to buy the T.Y. Guide, the detectives asked the pharmacist to inform them of Purvis’s next visit to the store.
On January 3, 1984, the pharmacist t(0 Detectives Martin and Rice that Purvis would be coming into the drugstore to buy a T.V. Guide. The detectives followed Pur-vis to the drugstore and watched as he parked his car in front of the store at about 4:45 p.m. As Purvis left his car, the detectives told him that they wanted to clear up some unanswered questions and discrepancies regarding his November 9th statement. Purvis asked to call his mother, and Detective Martin told Purvis that he, Martin, could call her from the police station. Purvis then agreed to accompany the detectives to the police station in their car.
Upon arrival at the police station at about 5 p.m., the detectives placed Purvis in an interrogation room. Purvis once again requested to call his mother, and Detective Martin asked Purvis whether he, Martin, could make the call. Although Purvis agreed to have the detective make *1412 the call, the facts are in dispute as to whether Detective Martin attempted to call Purvis’s mother before Purvis confessed.
On this second visit to the police station, Purvis waited approximately thirty minutes in the interrogation room for Dr. Klass to arrive. During this wait, Purvis made another request to call his mother, but was denied permission. Dr. Klass arrived at about 5:30 p.m., introduced himself as a psychiatrist, and proceeded to ask Purvis general orientation questions. Dr. Klass questioned Purvis for about five to ten minutes with both Detectives Rice and Cia-ni in the interrogation room; thereafter, sometimes one and sometimes both detectives were in the interrogation room.
During the initial questioning, Dr. Klass asked Purvis about his relationship with Susan, and Purvis responded that he liked Susan and had visited her occasionally. Later in the interrogation, Dr. Klass showed Purvis eight to ten thematic apper-ception cards (TAT). One of the TAT cards depicted a man with a knife standing over an individual, and another card showed a woman reclining only partially clad, with a man in the foreground fading away. Upon seeing these cards, Purvis became upset, jumped up several times yelling that he did not kill the girl, and yelling that he did not kill the baby.
After the detectives calmed Purvis down, they left him alone with Dr. Klass. About five minutes lapsed before Purvis asked Dr. Klass if the police would send him to jail or to a mental hospital. Dr. Klass testified at the pretrial hearing that upon hearing this question, he felt that Purvis was involved in Susan's murder. Minutes later, Purvis calmly held up his hand in a stabbing motion and told Dr. Klass that he killed Susan. Purvis then repeated several times that he killed Susan. Dr. Klass asked Purvis how many times he stabbed Susan, and Purvis said more than two times. Dr. Klass then asked Purvis where he stabbed her, and Purvis stated that he stabbed her in the heart. On this date, up to this point, Purvis had not been advised of his Miranda rights.
Dr. Klass asked Purvis several other questions, including the color of Susan’s underwear and Purvis’s feelings towards her. Purvis immediately answered that Susan wore a beige bra and white panties. Purvis went on to tell Dr. Klass that he cared about Susan; that she was not responsive; that he stabbed her in the heart; that she wore a beige bra and white underwear; that he used a lamp cord from his home to strangle her; that he brought the knife from his home; that he had told his mother of the stabbing, and that his mother told him he had done a horrible thing and not to tell anyone about it.
After Purvis incriminated himself, Dr. Klass left the room and spoke with Detectives Rice, Martin, and Ciani in order to get information only Susan’s killer would have known. During this conversation, Klass asked Detectives Martin and Rice the color of Susan’s underwear. Through the use of the colored photographs of the scene of the crime, the detectives told Dr. Klass the color of Susan’s underwear, which matched Purvis’s description. The detectives testified that from the time Dr. Klass left the room and held this conversation, Purvis was no longer free to leave the police station.
After discussing Purvis’s statements with the detectives, Dr. Klass went back into the room with Detectives Rice and Ciani. Both Klass and the detectives asked Purvis questions such as “were you in love with her, did you kill her, did you strangle her with the cord, did you stab her with the knife.” Purvis answered affirmatively to all these questions. In the meantime, Detective Martin contacted Purvis’s mother and informed her that Purvis had confessed to killing Susan.
When Detective Martin returned to the interrogation room, Detective Rice relayed the contents of Purvis’s confession. Detective Martin started to advise Purvis of his Miranda rights, and Purvis stated that he was aware of his rights. Nonetheless, the detectives gave Purvis a Miranda warning before recording his confession.
*1413 PROCEDURAL HISTORY
In January, 1984, a grand jury issued a three-count indictment against Purvis alleging: (a) first-degree murder of Susan; (b) sexual battery of Susan with great force; and (c) second-degree murder of Shane Hamwi. On May 22, 1984, Purvis’s lawyer filed a pretrial motion to suppress the confession arguing that Purvis was in custody during the entire interrogation and did not receive a Miranda warning before incriminating himself. The state argued that Purvis was not in custody until Dr. Klass left the room and spoke to the detectives. Therefore, according to the state, the statements made to Dr. Klass before he left the room were admissible. The Florida Circuit Court, Seventeenth Circuit, granted Purvis’s motion to suppress all matters discussed after Dr. Klass left the room.
At trial, Dr. Klass testified as to the corroborating details of the oral confession including the color of Susan’s underwear, Purvis’s amorous feeling toward her, and Purvis’s statement that he stabbed her in the heart. The jury convicted Purvis on all three counts, and the trial judge sentenced Purvis to life imprisonment without parole for twenty-five years on the first count, a concurrent twenty-year sentence for the sexual battery count, and a consecutive twenty-year sentence for the second-degree murder of Shane Hamwi. During trial, Purvis’s lawyer filed a motion for mistrial arguing that Dr. Klass’s statements at trial violated the pretrial suppression order. The trial court denied the motion. On appeal the Florida Fourth District Court of Appeals affirmed the trial court’s decision per curiam. See Purvis v. State, 500 So.2d 1360 (Fla. 4th D.C.A. 1987).
After exhausting state remedies, Purvis filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The federal district court referred the matter to a magistrate judge who found that Purvis was not in custody until Dr. Klass left the room and spoke to the detectives. Therefore, the magistrate judge concluded that Purvis’s statements made before Dr. Klass left the room were properly admitted at trial. Accordingly, the magistrate judge recommended denial of Purvis’s habeas corpus petition. The district court adopted this recommendation and denied relief.
CONTENTIONS
Purvis contends that the district court erred in denying his petition for writ of habeas corpus because he was in custody at all times during Dr. Klass’s interrogation and because his history of psychological treatment and his suggestive child-like behavior made him particularly susceptible to psychological coercion. Additionally, Purvis contends that Dr. Klass’s trial testimony regarding the corroborative details of the murder violated the pretrial suppression order.
In response, the state contends that the district court properly denied Purvis’s petition for habeas corpus relief.
ISSUES ON APPEAL
Purvis presents three issues on appeal: (1) whether he was in custody for purposes of Miranda when he initially confessed to killing Susan Hamwi; (2) whether his Miranda rights were violated when the trial court permitted Dr. Klass to testify as to the incriminating details of the killing; and (3) whether the detectives exercised deception and psychological coercion which rendered his initial confession involuntary, thus violating the fourteenth amendment due process clause.
DISCUSSION
I. In Custody
Purvis contends that the district court erred in finding that he was not in custody when he initially confessed to killing Susan. Purvis argues that neither a reasonable person nor a reasonably suggestible submissive and childlike schizophrenic with an eight-year-old’s understanding of waiver of rights would have perceived himself free to leave the police station or to refuse interrogation. Therefore, Purvis argues that all of his statements, including the initial confession and the subsequent corroborative details, should have been suppressed as the *1414 product of a custodial interrogation absent Miranda warnings.
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that the fifth amendment privilege against compulsory self-incrimination applied only in the context of custodial interrogation. Miranda, at 444, 86 S.Ct. at 1612. The Court defined custodial interrogation as “questioning initiated by law enforcement officials after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Miranda, at 444, 86 S.Ct. at 1612. The Court adopted an objective reasonable man standard for cases involving custodial interrogation. Berkemer v. McCarty, 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984).
The Court later narrowed custodial interrogation to “restraint of a suspect’s freedom of movement of the degree associated with a formal arrest.” Minnesota v. Murphy, 465 U.S. 420, 430, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984) (quoting California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983)). Following the Supreme Court’s custodial interrogation decisions, this court held that a defendant who was never placed under arrest or restrained in any way while making oral statements at a police station was not restrained to the degree associated with a formal arrest. United States v. Phillips, 812 F.2d 1355, 1362 (11th Cir.1987). This is the principle of law to be applied in this case.
In denying Purvis’s petition for writ of habeas corpus, the district court adopted the magistrate judge’s recommendation approving the state trial court’s finding that Purvis was not in custody when he initially confessed to killing Susan. The district court noted the state trial court’s findings that Purvis went to the police station voluntarily, was not initially placed under arrest, and was free to leave the station up to the point that Dr. Klass spoke to the detectives regarding Purvis’s confession. The state trial court found and the district court concluded that the moment Dr. Klass left the room, Purvis was no longer free to leave the police station; thus, he was in custody for purposes of a Miranda warning. The district court further found that the state trial court suppressed all of Pur-vis’s statements subsequent to Dr. Klass leaving the room in accordance with the pretrial suppression order.

Presumption of Correctness

In a federal habeas corpus proceeding pursuant to 28 U.S.C. § 2254, a state court’s factual findings are entitled to a presumption of correctness. 28 U.S.C. § 2254(d).[1] See also Buck v. Green, 874 F.2d 1578, 1580 (11th Cir.1987).
*1415 The state trial court was in the unique position, after observing Purvis and listening to the evidence presented at trial, to determine whether a reasonable person in Purvis’s position would have felt free to leave the police station. The state trial court found that Purvis was not deprived of his freedom of action and that he had sufficient intellectual capacity to understand the circumstances surrounding his questioning.
A review of the trial transcript shows that the court’s findings met the requirements of section 2254(d); thus, they are entitled to a presumption of correctness. Given the state trial court’s fact finding, a reasonable person in Purvis’s position would not have believed himself restrained to the degree associated with a formal arrest. See Minnesota v. Murphy, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). As the state trial court found, Purvis voluntarily went to the police station and was never placed under arrest or restrained in any way during his initial interview with Dr. Klass. In fact, Purvis left the interrogation room at one point to get a drink of water. Purvis never requested a lawyer during the interview and never asked the doctor and the detectives to terminate the interview. Additionally, Purvis never asked to go home until after he confessed to killing Susan Hamwi. Thus, Purvis’s initial interview did not exert the “inherently compelling pressures which work[ed] to undermine the [appellee’s] will to resist_” United States v. Phillips, 812 F.2d 1355, 1362 (11th Cir.1987) (quoting Miranda v. Arizona, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966)). Accordingly, Purvis’s initial confession to Dr. Klass was not the product of a custodial interrogation in violation of Miranda.[2] Furthermore, after Miranda warnings, Purvis gave the detectives a recorded confession.
II. Pretrial Suppression Order
Purvis next objects to Dr. Klass’s testimony during trial regarding the corroborative details of the murder. Purvis points to two paragraphs from the pretrial suppression order which states:
4.
After the defendant had provided these corroborated details, Dr. Klass conferred with the police detectives and reviewed photographs with the detectives to determine the truth or accuracy of the defendant’s claims. After this review, Detective Rice testified that the defendant was no longer free to leave.
5.
Up until that point this court finds that the defendant was at the police station voluntarily, that there were no restraints placed upon him and that he was not in custody for the purposes of invoking Miranda warning.[3] Purvis argues that the word “after” in paragraph four should read “before,” thus the state trial court’s *1417 fact finding in the motion to suppress should not be entitled to a presumption of correctness under 28 U.S.C. § 2254(d).
Our review of the record shows that Dr. Klass’s testimony at trial did not violate the pretrial suppression order. The state trial court was in the unique position to decide what information Dr. Klass received from Purvis while the two were alone after listening to all of the witnesses and the evidence presented. The state trial court found that Dr. Klass received some of the corroborative details regarding Susan Hamwi’s murder prior to leaving the room. As Dr. Klass’s testimony on direct examination shows, he testified only to these corroborative details. Thus, we will afford the state trial court’s findings a presumption of correctness under section 2254(d) in finding that Dr. Klass’s testimony did not violate the pretrial suppression order. The presumption of correctness which we afford the state trial court is mandated by Supreme Court and Eleventh Circuit precedent.
III. Deception and Psychological Coercion
Purvis next contends that independent of the Miranda violations, the detec *1418 tives utilized deception and psychological coercion which rendered his initial confession involuntary. Purvis argues that he was denied due process of the law because his conviction rests on an involuntary confession which offended both strands of the voluntariness test enunciated in Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1938).
First, Purvis argues that his confession is unreliable because the state failed to introduce any physical evidence linking him to the killings. Additionally, Purvis argues that his testimony as to the corroborative details: the color of Susan’s clothing, the number of times he stabbed her, the type of cord he used to strangle her, and the death of Susan’s baby, Shane, did not match the physical evidence presented at trial.
Second, Purvis argues that his confession was the product of abusive law enforcement tactics based on deception and psychological coercion. Purvis specifically notes the detectives’ scheme to separate him from his mother by refusing to contact her or allowing him to contact her while he was at the police station. Purvis also notes Dr. Klass’s use of the TAT cards on his “fragile mind,” his extreme susceptibility to authority figures, and his eight to ten-year-old mentality.
Unlike the in custody analysis, the voluntariness of a confession is not an issue of fact entitled to a presumption of correctness under 28 U.S.C. § 2254(d). Miller v. Fenton, 474 U.S. 104, 117, 106 S.Ct. 445, 453, 88 L.Ed.2d 405 (1985). Although the state court’s findings of fact regarding voluntariness are accorded credit, the ultimate issue of voluntariness is a legal question requiring independent consideration in a federal habeas corpus proceeding. Miller, at 115. See also Williams v. Johnson, 845 F.2d 906, 909 (11th Cir.1988).
In this ease, the district court conducted an independent federal review of Purvis’s involuntariness claim and concluded that Purvis’s confession was voluntarily made. The district court adopted the state trial court’s credibility findings regarding Pur-vis’s demeanor, his intelligence, and his responsiveness to questions at trial. The court then conducted a thorough examination of Dr. Klass’s use of the TAT cards and concluded that Dr. Klass did not coerce or deceive Purvis. Additionally, the district court found no evidence of coercive police conduct. A review of the record indicates that the district court correctly found that Purvis’s confession was not the result of deceptive or psychologically coercive police conduct.
Purvis vehemently argues that his history of schizophrenia, his susceptibility to authority figures, and his childlike mentality renders his confession involuntary. Pur-vis compares the alleged coercive tactics of the detectives in this case to the police officers in Blackburn v. Alabama, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1959). Purvis, however, ignores the extreme police overreaching in Blackburn. In Blackburn, the defendant was insane and incompetent at the time he confessed. Moreover, the police officers exploited the defendant’s weaknesses during a sustained eight to nine hour interrogation in a tiny room literally filled with police officers in the absence of the defendant’s lawyer. Blackburn, at 207, 80 S.Ct. at 280.
In this case, Purvis was in an interrogation room with Dr. Klass for approximately one hour. The detectives walked in and out of the room, but for the most part and particularly when he initially confessed to killing Susan, Purvis was alone with Dr. Klass. Consequently, the circumstances surrounding Purvis’s confession are not comparable to the level of coercive activities evident in Blackburn.
Purvis further relies on Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) to support his contention of psychological coercion. In Connelly, the defendant suffered from chronic schizophrenia and was in a psychotic state the day before he confessed to the murder. The Supreme Court held that the defendant’s mental condition by itself was not enough to render the confession constitutionally involuntary. Connelly, at 164, 107 S.Ct. at 520.
*1419 As the district court found, the record in this case does not support Purvis’s contention of deception and psychological coercion. The detectives did not deceive Purvis when they initially invited him to the police station. They specifically told Purvis that they needed to ask him some questions regarding his prior statements. Furthermore, Dr. Klass’s use of the TAT cards was not psychologically coercive. Consequently, Purvis’s psychological coercion claim must fail under Connelly absent police coercion.
CONCLUSION
We hold that the district court correctly denied Purvis’s petition for writ of habeas corpus. Accordingly, we affirm the district court.
AFFIRMED.

. Section 2254(d) states:
In any proceeding instituted in a federal court by an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit: (1) that the merits of the factual dispute are not resolved in the State court proceeding: (2) that the fact finding procedure employed by the State court was not adequate to afford a full and fair hearing; (3) that the material facts were not adequately developed at the State court hearing; (4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding; (5) that the applicant was an indigent and that the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding; (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or (7) that the applicant was otherwise denied due process of law in the State court proceeding; (8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record: And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered *1415 (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.
Purvis does not argue that his case falls within any of the eight exceptions listed in section 2254(d). Furthermore, the record amply shows that Purvis fails to meet any of the exceptions.

. We reject the dissent’s speculation that Pur-vis’s ride to the police station in the detective's car and the request to call his mother may be equated with attempts to stop the interview and leave the station.

. Pertinent portions of Dr. Klass’s testimony at trial are as follows:
Direct examination:
A. Not at that point. In fact, he became less guarded. At a later point he did and gave what I was later to learn was incorrect information. But at that point he seemed to be almost wanting to talk about it because I was needing to ask him less and he was like volunteering more. He would come out with something that didn’t almost relate to what the previous thought was and I felt there was some statements that had an implication.
Q. When you say ‘statements that had an implication,' what type of statements are you referring to?
A. I don't recall the exact sequence but at one point he asked if he would have to go to jail or could he go to a hospital. At another point he suddenly became totally relaxed *1416 when he said that he did kill her, that he didn't use the word stab but he used a motion with his hand like this, and so as not to—
Q. Let me get back to that in just a second. You say he became totally relaxed when he said he did kill her. Did you have an opportunity to examine his demeanor, his facial expression and body language, if you will, at the time that he made that admission?
A. Yes.
Q. Was it appropriate for the admission that he made?
A. Yes, it was.
Q. And in what way would you describe the manner in which he made that admission to you? How did he say it?
A. Well, at first, he was not fully appropriate when he was stating rather loudly do you think I did it, do you think I did it. And then when he did say that he killed her, he sat down and he looked downward with his eyes and appeared more relaxed as if unburdening himself and he shook his head saying, 1 killed her, I liked her,’ and in essence that she would not respond to his interest and that he picked up his eyes and he said I killed her but he did not I recall say the word stab because when he made the motion, I was thinking that could still be any number of different ways, with a utensil or whatever. So I wanted to again try to get information that only a perpetrator would know.
So I asked him what that referred to and he said, ‘Well, I stabbed her.' But he made several motions indicating to me, I thought, that he would have stabbed her numerous times. So I asked him is that the way he stabbed her, because I thought it may also be important whether it was overhand or underhand or right or left-handed, and he used his right hand and made an overhand motion, and although he stabbed several times he said, ‘Well, I stabbed her in the heart,' and I said, ‘One time?’ He said, ‘Oh, it might have been twice,' something to that effect.
I think he was not fully clear. But when I tried to delineate it, the result was that it was twice but like a major stab in the heart was what he seemed to be relating to because he used that phrase I stabbed her in the heart whereas many people don’t know exactly where the heart is located in the chest.
Q. After he had indicated that he had stabbed her in the heart and perhaps stabbed her another place, was there any further discussion or verification by you as to any observations that he had made about her body? Do you understand what my question is? It’s kind of a blanket stated question.
A. I think so. I know the police were interested later in specific details whereas at that time my interest was to make sure that he was not unduly stressed and to obtain information perhaps that only a perpetrator would know.
So I did have him — I had some specifics but the specifics I thought would be those things that a perpetrator would be more interested in, such as if there was a sexual act the color of the woman's undergarments rather than what I felt might be incidental details that a person that state of mind would not have any recall about.
Q. Let me pause here for a second. Were you aware by this time of some of the defendant's mental history?
A. Nothing specific.
Q. Had you been able to form an opinion yourself as to what the defendant's mental condition was?
A. At the time I interviewed him?
Q. Yes, sir.
A. Yes, I did.
Q. What was your opinion as to the defendant’s mental condition?
A. I felt he was anxious, he felt tension, he had I believe as a result of the tension he felt a psychological disorder, what we call loose associations in that his speech was not fully coherent, there was some non sequiturs, things that just didn’t follow in a paragraph-like form.
But he was aware certainly of his surroundings. He was well-oriented. He knew what the situation was so that he was not psychotic.
Q. When you mentioned a mental disorder, were you able to make a determination at that point what type of a mental disorder he might be suffering from?
A. Yes.
Q. And what was your evaluation as to his mental disorder?
A. The diagnosis would be schizophrenic reaction, chronic undifferentiated type.
Q. Now, a person who would be suffering from that type of reaction, and based upon your knowledge of John Purvis at that time, having interviewed him and discussed with him, why would you spend time determining the color of the victim’s underwear and bra as opposed to other factors surrounding the environment? Why would you pick that?
A. Well, there were several things which the police had started to show an interest in questioning him about because at times they would be in the interviewing rooms, at times not, and the things that they would ask him I felt would not be of interest to recall for someone who may be a perpetrator of a violent and perhaps sexual act. So that I felt that it would be more fruitful to explore the areas that someone in that circumstance may have an awareness about because that was — that would be their interest at the moment such that, for instance, a robber might be more interest in the safe in the room that in the color of a drapery. So in the same way I therefore explored if he recalled the color of the woman’s undergarments.
Q. And what was the defendant’s response when you asked him about the color of the victim’s undergarments?
A. He immediately said that her bra was beige and her panties were white.
Q. Was there any hesitation at all in that description?
*1417 A. No, that was immediate.
Q. Did you yourself ever later have an opportunity to verify that yourself through photographs?
A. Yes.
Q. Was the defendant correct as to the white panties and beige bra?
A. Yes, he was.
Q. Did the defendant ever during this period of time mention what role, if any, his mother played in this?
A. Yes.
Q. What did he say?
A. Well, I was talking to him about how he must have felt at the time and what he did. He did show a remorseful response and in responding to what he did, he said that he went home and told his mother.
Q. Did he tell you how she responded to that?
A. Yes.
Q. What did he say?
A. He said that her reply was that it was horrible but not to tell anyone.
Q. Was there ever a discussion with you during this period of time about any type of ligature or cord?
A. Yes, as more of the questioning continued, there was reference at one point I believe introduced by the police about cord.
Q. I’m not interested in anything that the police introduced. The only thing I’m interest in is something that the defendant introduced.
Did he himself initially introduce anything about a cord?
A. I can’t recall if that’s something he initially introduced or if that was in response to a question by the police or myself.
Q. How long was the conversation that you had with the defendant?
A. I would have to guess at an hour from beginning to end, from the time I entered the room at about 5:20 till when I left although I did not check my watch. But I assumed about an hour.
Q. Was there anything about the defendant’s manner or demeanor or anything in the way he answered his questions to you that was suggestive to you that he was not being truthful when he spoke to you?
A. There was a time later in the interview when he appeared tired and disinterested wanting to just avoid what appeared to be uncomfortable matter and then seemed to not be thoughtfully responsive to the question as if he would almost repeat what was said or would not give full attention to it.
Q. When he first described to you the killing of Susan Hamwi, was there anything at that time in his manner or demeanor that would suggest that the defendant was not at that point telling you the truth?
A. No.
Q. When he described the piercing of her heart with a knife, was there anything in his manner or demeanor at that point that was suggestive that he was not telling you the truth?
A. No.
Q. When the defendant described the actions of his mother, was there anything in his manner or demeanor at that point that was suggestive that he was not telling you the truths?
A. No. V*
Cross examination:
Q. All right. Now, did there come a time when you were alone with him?
A. Yes.
Q. When was that?
A. It may have been a time before I showed him the cards and after.
Q. The police were in and out during the interview?
A. Yes, not repeatedly, but there were perhaps two or three times when they would be in the room and then out.
Q. And you’ve testified, I believe, that it was during one of these periods of time that John made the statement to you am I going to jail or to a hospital?
A. Something to that effect. Would he have to go to jail or could he go to a hospital, something to that effect.