36 F.3d 1098
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Cheri L. WELCH, Defendant-Appellant.
 No. 93-4043.
 United States Court of Appeals, Sixth Circuit.
 Sept. 19, 1994.
 
 Before: LIVELY, MARTIN and SUHRHEINRICH, Circuit Judges.
 PER CURIAM.
 
 
 1
 Cheri Welch entered a conditional guilty plea to a charge of murder in the second degree. On appeal, she argues that the district court erred in failing to suppress her confession because it was the involuntary product of coercion and she was questioned in violation of Miranda v. Arizona, 384 U.S. 436 (1966). She also challenges the district court's provisional ruling on her motion in limine to prevent the introduction of evidence regarding wrongful acts not charged in the indictment.
 
 
 2
 * On December 28, 1984, four-month-old Holly Welch died at home in Aeia, Hawaii. The cause of death was reported to be Sudden Infant Death Syndrome. On August 12, 1986, seven-month-old Krystina Elizabeth Welch died at the Children's Medical Center in Dayton, Ohio. The suspected cause of death was Reflex Apnea. On February 24, 1989, Nicholas Welch, then two weeks old, was rushed to the Children's Medical Center in Dayton. Blue in color and bleeding profusely from the nose, Nicholas was resuscitated by the medical staff. He subsequently recovered. Air Force Sergeant Timothy Welch and his wife, Cheri, are the parents of all three children.
 
 
 3
 Following Nicholas' near death, the Family Advocacy Office at the Medical Center on Wright-Patterson Air Force Base, suspecting that Nicholas' injuries were caused by other than natural causes, contacted the Air Force Office of Special Investigations to report a possible case of child abuse. Shortly thereafter, the OSI opened an investigation into the incident.
 
 
 4
 During the course of the investigation, OSI agents learned that two of the Welches' other children, Holly and Krystina, died in infancy. Their suspicions aroused, the agents began to gather information regarding the deaths, including medical records, police reports, and autopsies. They also interviewed Tim Welch at great length on more than five occasions. During these interviews, which took place in August, September, and October of 1990, Tim Welch reviewed in detail the circumstances surrounding the deaths, and described his relationship with Cheri Welch and their five children. He further recounted that, on numerous occasions, his wife told various individuals bizarre, unsubstantiated tales about being abused or raped, receiving treatment for cancer, and suffering miscarriages.
 
 
 5
 On September 10, 1990, OSI Investigator Dennis Parker was notified that a base resident had been the victim of a crime and directed to the Wright-Patterson Air Force Base hospital. When Parker arrived, he discovered that Cheri Welch was being treated for injuries she allegedly received when an unidentified male attempted to rape her while she was working at the Dayton Baptist Temple Child Care Center. While reviewing Cheri Welch's medical file to learn more about the attempted rape, Parker remembered that the Welches were leading suspects in the OSI's on-going murder investigations. Parker knew that the OSI agent in charge of the inquiry suspected that one or both of the Welches were responsible for the girls' deaths, but had been unable to procure conclusive proof.
 
 
 6
 The following day, Parker met with Cheri Welch to learn more about both the rape attempt and the deaths of her two daughters. During the two-hour interview, which took place at the OSI office on Wright-Patterson, Parker explored Welch's family situation, the deaths of her daughters, her personal background, and the alleged rape incident. Throughout, Parker strove to earn Welch's trust and to discover "things that motivate Mrs. Welch" in an effort to further the murder investigation.
 
 
 7
 When Parker confronted Welch at some point during the interview with evidence gathered at the Baptist Temple that suggested that no assault had taken place, Welch admitted that she had fabricated the story and inflicted the injuries upon herself. Parker then assured Welch that he would pass her recantation on to the Dayton Police, but warned her that filing a false police report was, in all likelihood, a violation of state law. After Welch wrote out a retraction statement, Parker took her home.
 
 
 8
 Approximately six weeks later, an OSI agent telephoned Tim Welch at work and asked him to bring Cheri to the Wright-Patterson hospital for an interview. Tim Welch immediately went home, told his wife about the call, and urged her to meet with the agents "to get this all over with." He then drove Cheri Welch to the hospital and accompanied her to the fifth floor, where they were met by Agent Parker, who was dressed in plain clothes. Telling the Welches that he wished to speak with Cheri alone, Parker sent Tim home.
 
 
 9
 Parker then walked Cheri Welch down a hallway and into a small office that was furnished with two chairs, two tables, and an x-ray viewer screen. Unbeknownst to Welch, the office was also equipped with a hidden camera and several hidden microphones. In the office next door, a number of OSI agents, an Assistant United States Attorney, and an OSI criminal psychologist monitored the encounter.
 
 
 10
 At the outset, Parker explained to Welch that her presence was voluntary, that she could refuse to answer any question he might pose, and that she could leave at any time. Welch indicated that she understood.
 
 
 11
 Parker then began the interview by telling Welch that he had interceded on her behalf with the Dayton Police Department and, as a result of his efforts, she would not be prosecuted for filing a false police report. According to Parker, he promised the police that he would follow up with Welch and ensure that she was addressing her personal problems. In fact, Parker had made no such promise.
 
 
 12
 After Welch expressed hope that counseling, which she had begun a few weeks earlier, would help her deal with her problems, Parker told Welch that he thought she would look back on "today as the day when things got a lot better." Urging Welch to unburden herself, Parker asked her to tell him what "really happened" to her daughters. Parker also repeatedly referred to a "connection" between various traumatic events in Welch's past and the death of Welch's daughters.
 
 
 13
 When Welch continued to deny responsibility for her daughters' deaths, Parker confronted her with the results of a "new DNA test" that established that Krystina had not died of Sudden Infant Death Syndrome. No such testing had actually been done. Parker also opined that circumstantial evidence indicated that Welch was involved in both deaths, stressed that Welch's marriage would continue to suffer unless she was completely honest, and told Welch that people would not understand her actions unless she told her side of the story.
 
 
 14
 Ultimately, Welch confessed to suffocating her two daughters, Holly and Krystina, and to attempting to suffocate her son, Nicholas. At this point, Parker first advised Welch of her Miranda rights. Parker then asked Welch to write an account of what transpired and to recount her motivation for acting. After Welch finished the written statement, she was placed under arrest and transported to the United States Marshals' Office in Dayton. While there, Parker asked Welch to supplement her written confession by describing certain events in greater detail. She complied.
 
 II
 
 15
 On November 13, 1990, a federal grand jury returned a two-count indictment against Welch. The first count charged Welch with the first degree murder of Krystina, in violation of 18 U.S.C. Sec. 1111, and the second count charged Welch with the attempted murder of Nicholas, in violation of 18 U.S.C. Sec. 1113. Welch initially entered a plea of not guilty, then filed a notice of intent to rely on an insanity defense.
 
 
 16
 A series of court-ordered psychological evaluations followed. After reviewing extensive records and interviewing dozens of Cheri Welch's relatives and acquaintances, Dr. Phyllis Kuehnl concluded in March 1991 that Welch suffers from "a mental illness that has gone unrecognized by doctors, her husband and several significant others." According to Dr. Kuehnl:
 
 
 17
 It is the opinion of the examiner that Cheri Welch did not have the capacity to know right from wrong or to conform her behavior to the law at the time of the alleged events. She suffers from a borderline personality disorder with psychotic episodes and is legally insane. Her delusional thinking is still evident and is chronic in nature.
 
 
 18
 In May 1991, evaluators at the Federal Correctional Institution in Lexington disagreed, finding that Welch suffered from a personality disorder, but was not psychotic. Individuals with this particular disorder, commonly termed a fictitious disorder ("Fictitious Disorder Not Otherwise Specified/Personality Disorder Not Otherwise Specified With Histrionic, Dependent, and Borderline Features") or Munchausen's Syndrome, chronically feign physical or psychological symptoms for the purpose of assuming and maintaining the role of a patient.
 
 
 19
 Welch was evaluated again in December 1991 by clinical psychologist Arthur Aaronson, who observed that Welch "has been diagnosed as having a borderline personality and/or a Munchausen syndrome by proxy." Dr. Aaronson subsequently testified that an individual with Welch's test results tends "to comply with the demands of authority figures. The way that, typically, they tend to deal with authority is often, rather than outright, expressing outright rebellion, what they'll do is, they'll tell a person what they want to hear in order to make some kind of gains."
 
 
 20
 Welch subsequently moved to suppress her oral and written confessions, raising two primary arguments. First, Welch maintained that her confessions were inadmissible because she was in custody during the entire November 1, 1990, interrogation, but did not receive Miranda warnings prior to incriminating herself. In addition, Welch argued that her confessions were the product of unlawful, psychological coercion.
 
 
 21
 Following a two-day hearing, which included both testimony from Dr. Aaronson that Welch "was psychologically coerced" into confessing to Agent Parker because she viewed the OSI agent as a "therapist" and a review of the videotaped confession, the district court denied the suppression motion.
 
 
 22
 On January 7, 1992, Welch filed a motion in limine seeking to exclude all evidence regarding the death of Holly Welch in Hawaii in 1984. The district court denied the motion on May 22, 1992.
 
 
 23
 On November 16, 1992, Welch entered a conditional guilty plea to a single-count superseding indictment, which charged her with second-degree murder under 18 U.S.C. Sec. 1111.
 
 
 24
 On September 9, 1993, the district court sentenced Welch to life imprisonment. Characterizing the case as "perhaps the most tragic case that I have ever dealt with in almost a quarter century of being a Judge," the district court expressed a willingness to consider a sentence reduction only if Federal Medical Center personnel subsequently indicated that Welch could be rehabilitated. This timely appeal followed.
 
 III
 
 25
 Arguing that Agent Parker preyed on her unique susceptibilities by fostering a therapy-like environment, peppering her with authoritative theories of "what actually happened," and fabricating incriminating evidence, Welch initially contends that her confessions were coerced and thus involuntary. When a defendant claims that her confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was voluntary. United States v. Wrice, 954 F.2d 406, 410 (6th Cir.), cert. denied, 112 S.Ct. 2286 (1992). While this Court "will not disturb the trial court's findings concerning specific events surrounding the confession" unless clearly erroneous, id. at 410-11, we review the district court's conclusions regarding voluntariness under a de novo standard. United States v. Rigsby, 943 F.2d 631, 635 (6th Cir.1991), cert. denied, 112 S.Ct. 1269 (1992).
 
 
 26
 A confession is involuntary if, in light of the totality of the circumstances, "the will of the accused has been overwhelmed by official pressure." Wrice, 954 F.2d at 411. To support a determination that a confession was coerced, the evidence must establish that: (1) the police activity was objectively coercive; (2) the coercion was sufficient to overbear the defendant's will; and (3) the defendant's will was, in fact, overborne by the coercive police activity. McCall v. Dutton, 863 F.2d 454, 459 (6th Cir.1988), cert. denied, 490 U.S. 1020 (1989). In assessing whether the alleged coercion was sufficient to overbear an accused's will, we have considered relevant a defendant's age, her education and intelligence, her physical condition and emotional state, the use of physical punishment, and the duration and location of the questioning. Wrice, 954 F.2d at 411; see also Withrow v. Williams, 113 S.Ct. 1745, 1754 (1993) (listing factors). The mere fact that a defendant suffers from a mental condition that impairs her volitional capacity is insufficient to render a confession constitutionally involuntary. Colorado v. Connelly, 479 U.S. 157, 164 (1986); United States v. Newman, 889 F.2d 88, 94 (6th Cir.1989), cert. denied, 495 U.S. 959 (1990).
 
 
 27
 Welch insists that Parker was well aware that she suffered from a fictitious disorder and, with the help of an OSI psychologist, designed the interrogation (including the setting, the questions, and Parker's role) to maximize the coercive effect. Emphasizing her susceptibility to authority figures, Welch identifies as unduly coercive Parker's therapist-like manner, his fabrication of DNA testing results, and his repeated references to the emotional benefits of revealing "what really happened." Such tactics, Welch asserts, overwhelmed her free will and were the "crucial motivating factor" behind her decision to confess. McCall, 863 F.2d at 459 (quoting Connelly, 479 U.S. at 166). We are not persuaded.
 
 
 28
 A careful review of the record leaves us convinced that there is insufficient evidence of objectively coercive police conduct in this case. Having met with Parker at the OSI office on September 11, Welch was fully aware of the fact that he was an OSI agent. On the day in question, Parker specifically told Welch that he wished to question her about the deaths of her daughters, and explained that both her presence and participation were voluntary. Throughout the two-hour interview, Parker, who was dressed in plain clothes and did not carry a weapon, was polite and courteous. He neither threatened Welch, nor promised lenient treatment if she confessed. Welch, a twenty-six-year-old woman with a high school education, appeared calm, collected, and cooperative during the interview. She was not interrogated for a long period, was not confronted by a phalanx of police officers, was not denied access to family members or to an attorney, and was not deprived of food, drink, or medicine. Given these circumstances, we cannot conclude that a reasonable person in Welch's position would have felt coerced. United States v. Gordon, 812 F.2d 965, 967-68 (5th Cir.) (confession voluntary despite defendant's psychological problems, "including Battered Women's Syndrome, dependent personality disorder, depression, and alcohol abuse," and agents' "nurturing and supportive posture"), cert. denied, 482 U.S. 908 (1987); see also Purvis v. Dugger, 932 F.2d 1413, 1422-23 (11th Cir.1991) (confession voluntary even though defendant had the mentality of an eight-year old, had a history of schizophrenia, and was extremely susceptible to influence by authority figures), cert. denied, 112 S.Ct. 1485 (1992).
 
 
 29
 The fact that Parker falsely informed Welch that DNA testing established that Krystina could not have died from Sudden Infant Death Syndrome does not alter our conclusion. As the Supreme Court has emphasized, police misrepresentations do not necessarily render an otherwise voluntary confession inadmissible. Frazier v. Cupp, 394 U.S. 731, 739 (1969) (false statement by police that defendant's companion had confessed did not defeat the voluntariness of defendant's confession). Viewing the totality of the circumstances, Parker's deception did not exceed permissible bounds, particularly in light of the fact that Welch claimed that Krystina died of Reflex Apnea, not Sudden Infant Death Syndrome. See United States v. Harris, 914 F.2d 927, 933 (7th Cir.1990) ("it is well settled that police may use small deceptions while interrogating witnesses"). As there is insubstantial support for Welch's allegation that her confessions were the product of police coercion, the district court properly denied her suppression motion.
 
 IV
 
 30
 Arguing that she was in custody at the time she was questioned by Agent Parker, Welch asserts that her confessions were obtained in violation of the procedural safeguards established in Miranda v. Arizona, 384 U.S. 436 (1966). This Court has long recognized that law enforcement officers must give Miranda warnings only to those suspects who are in custody. United States v. Peete, 919 F.2d 1168, 1177 (6th Cir.1990); see also United States v. Warner, 971 F.2d 1189, 1201 (6th Cir.1992) ("a person is not entitled to be notified of her Miranda rights before an interrogation if that person is not 'in custody' "). As the Supreme Court has explained:
 
 
 31
 Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.
 
 
 32
 California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. 492 (1977)). An individual is not in custody "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." Id. Nor is a noncustodial situation "converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.' " Id. at 1124 (quoting Mathiason, 429 U.S. at 495).
 
 
 33
 Because a reasonable person in Welch's position would not have thought that she was in custody, we conclude that Parker was not required to advise Welch of her Miranda rights before questioning her on November 1, 1990. See United States v. Macklin, 900 F.2d 948, 951 (6th Cir.) (noting that crucial inquiry is "how a reasonable man in the suspect's position would have understood his situation") (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)), cert. denied, 498 U.S. 840 (1990). Aware that OSI agents were investigating the deaths of her daughters, Welch voluntarily came to the hospital to meet with Parker. At the beginning of the interview, Parker explicitly told Welch that she was free to leave or to cut off his questioning at any point. At no time was Welch physically restrained, informed that she could not depart, or told that she was under arrest. On these facts, Welch was not in custody and Miranda warnings were not required. We thus conclude that the district court properly denied Welch's motion to suppress her confessions.
 
 V
 
 34
 In her final challenge, Welch asserts that the district court erred in overruling her motion in limine without a hearing. In light of the fact that we affirm the district court's denial of Welch's suppression motion, we decline to address this contention.
 
 VI
 
 35
 For the foregoing reasons, the judgment of the district court is affirmed.