Phillip L. SAMPSON, Plaintiff,

v.

CITY OF XENIA, et al., Defendants.

No. C–3–97–437.

United States District Court,
S.D. Ohio,
Western Division.

March 19, 1999.

---

Timothy S. Chappars, Xenia, OH, for Plaintiff.

Jane M. Lynch, Green & Green, Dayton, OH, for Defendants.

DECISION AND ENTRY SUSTAINING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. # 21), INSOFAR AS IT IS DIRECTED TOWARD PLAINTIFF'S FEDERAL–LAW CLAIMS; PLAINTIFF'S STATE–LAW CLAIMS REMANDED TO THE COURT OF COMMON PLEAS FOR GREENE COUNTY, OHIO; DEFENDANTS' MOTION TO STRIKE (DOC. # 30) OVERRULED; FURTHER PROCEDURES ORDERED OF THE DEFENDANTS; TERMINATION ENTRY.

HERBERT, Chief Judge.

This matter comes before the Court upon a Motion for Summary Judgment (Doc. # 21) and a Motion to Strike (Doc. # 30) filed by Defendants City of Xenia, Danny O'Malley, Scott Anger, and Becky Grundy. The Defendants seek summary judgment on Plaintiff Phillip L. Sampson's eight-count Complaint (attached to Notice of Removal, Doc. # 1), which alleges a variety of Ohio common law and statutory claims, as well as a 42 U.S.C. § 1983 claim against each Defendant. The Complaint further alleges that the Defendants are liable individually and in their official capacities. The Plaintiff's Complaint stems from his mistaken confinement for more than three months after the dismissal of all charges against him.

I. *Factual and Procedural Background* [1]

In the course of investigating a series of breaking and enterings at area businesses, Xenia Police Detective Scott Anger learned that Phillip Sampson had been seen near the businesses on two nights. (Anger depo. at 28). After receiving this information, Anger spoke with Sampson, who voluntarily agreed to accompany the detective to the Xenia Police station for questioning. (*Id.* at 34). Prior to conducting the interview, which was videotaped, Anger informed Sampson of his *Miranda* rights. (Doc. # 27, videotape).[2] During the two-hour interview, Sampson at times responded to Anger's questions by denying any involvement in illegal breaking and entering activity. He admitted three times, however, that he "probably" would "fail" if Anger asked him the same questions while administering a polygraph test. Sampson also recalled that an alarm sounded when he kicked the door at one

1. For purposes of the present Motion for Summary Judgment, the Court will construe the facts and all reasonable inferences in a light most favorable to Sampson, the non-moving party. In its substantive analysis, *infra*, the Court will recite additional pertinent facts, again construing those facts and all reasonable inferences most strongly in Sampson's favor.

2. The videotape of Sampson's interview was filed with the Court by Plaintiff's counsel on September 3, 1998. (Doc. # 27). The Court notes that the videotape does not appear to have been authenticated for consideration in the summary judgment context. Both parties have referred to the tape in their Memoranda, however, and the Court finds the tape relevant to its disposition of the Defendants' Motion for Summary Judgment (Doc. # 21). As a result, *the Court hereby directs the Defendants to authenticate the tape within seven days, by filing an affidavit from Detective Scott Anger.* The Defendants' failure to do so will result in the Court vacating its judgment and reconsidering their Motion for Summary Judgment without considering the tape. The Court recognizes that the Plaintiff filed the unauthenticated tape. Nevertheless, given that the Defendants have prevailed in this litigation, and that they also have cited the tape, the Court finds it appropriate to require authentication from the Defendants.

area business. He told Anger that this incident occurred between 1:30 a.m. and 2:00 a.m. Additionally, Sampson admitted to Anger that sockets, screwdrivers, and wrenches were stolen from Xenia Transmission, an area business. Sampson denied personally removing the tools, but he admitted being present and told Anger that Xenia Transmission was the only place he ever "did" with his friends. Although Sampson appeared nervous during the interview, Anger did not abuse or physically threaten him. (*Id.*). Anger reminded Sampson that he was not under arrest, offered to take him home, and asked him, on several occasions, if he wanted to end the interview. (*Id.*).

Shortly after the interview, Anger returned to Sampson's home, where he re-interviewed Sampson and searched for stolen property. (Anger depo. at 41). Sampson voluntarily spoke with Anger, but he made no additional confessions, and Anger discovered no stolen property. (*Id.* at 41, 46). Thereafter, Anger discussed Sampson's case with a Greene County prosecuting attorney, who concluded that probable cause existed to arrest Sampson, based solely upon his statement. (*Id.* at 42). Anger subsequently signed a document captioned "Complaint and Affidavit," setting forth Sampson's alleged criminal activity. (*Id.* at Exh. 1). The document also was signed as "seen and approved" by the Green County prosecuting attorney and the Deputy Clerk of the Xenia Municipal Court. (*Id.*).

Sampson was arrested on September 13, 1996, and incarcerated in the Greene County jail. (*Id.* at 59–60). Anger interviewed Sampson again on September 16, 1996, hoping to obtain additional incriminating statements. (*Id.* at 60–62). During that interview, Anger began to question Sampson's involvement in the breaking and enterings and his mental capacity.

(*Id.* at 66, 68). Anger promptly expressed his concerns to the Greene County prosecuting attorney, who agreed to seek the dismissal of Sampson's case. (*Id.* at 27, 70). The Xenia Municipal Court judge did dismiss Sampson's case on September 19, 1996, and Anger had no further involvement with Sampson. (*Id.* at 74, Exh. 2).

Xenia Municipal Court Clerk Becky Grundy received the signed order dismissing Sampson's case, entered the information into the court's computer system, and placed the order in a tray. (Grundy depo. at 9–10, 15–16). One of the Municipal Court's three bailiffs was then responsible for hand delivering the signed entry to the Greene County jail. (*Id.* at 9–10, 16). At the time of Sampson's incarceration, the Xenia Municipal Court lacked any policy or procedure to ensure that jail officials actually received the dismissal entry and released Sampson. (*Id.* at 16, 23). Consequently, although his case had been dismissed, Sampson remained incarcerated in the Greene County jail. He later was transferred to the Dayton Mental Health Center, and then returned to the jail in December, 1996. Sampson was not released until January 8, 1997, some three and one-half months after the dismissal of his case, after a jail psychologist called the Xenia Municipal Court to inquire about his continued confinement.

Following his release, Sampson filed an eight-count Complaint in state court, asserting various state-law claims and a cause of action under § 1983 against the City of Xenia, Xenia Police Chief Danny O'Malley, Greene County Sheriff Jerry Erwin, Anger, Grundy, and various John, Jane, and Joe Doe Defendants. (Complaint, attached to Doc. # 1). Sampson's Complaint named the individual Defendants in both their individual and official capacities.[3] (*Id.* at ¶ 10). The City of Xenia, O'Malley, Anger, and Grundy sub-

---

**3.** A suit against an individual in his "official capacity" is nothing more than an action against the entity on whose behalf the individual acts. *Bush v. Rauch,* 38 F.3d 842, 849 (6th Cir.1994). Consequently, if the Defendant entities are not liable to Sampson, then the individual Defendants will avoid liability in their official capacities.

sequently removed the lawsuit to this Court on October 2, 1997.[4] (Doc. # 1). In a June 12, 1998, Entry and Order, this Court dismissed the action with prejudice, upon Sampson's Motion, as to Defendants Jerry Erwin, the Sheriff of Greene County, Ohio, and Joe Doe(s), Assistant Jailers/Deputies of the Greene County Sheriff's Department. (Doc. # 19). Pending before the Court are two Motions: (1) a Motion for Summary Judgment (Doc. # 21) filed by Defendants O'Malley, Anger, Grundy, and the City of Xenia; and (2) a Motion to Strike (Doc. # 30) filed by the same Defendants. The Court will first address the Defendants' Motion for Summary Judgment.

## II. Summary Judgment Standard[5]

The Court first will set forth the parties' relative burdens once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548. *See also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial[,]" quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 [6th Cir.1987] ). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1245 (6th Cir.1995). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for judgment as a matter of law under Fed.R.Civ.P. 50. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See also Michigan Protection and Advocacy Service, Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present

4. The Defendants' Notice of Removal states that Sampson's lawsuit had been brought against the City of Xenia, Danny O'Malley, Scott Anger, Becky Grundy and Jerry Smith. (Doc. # 1 at 1). The Court has been unable to locate any other reference to a Jerry *Smith*. In reality, Sampson's Complaint names as Defendants the City of Xenia, Danny O'Malley, Scott Anger, Becky Grundy, and Jerry *Erwin* (the Greene County Sheriff).

5. In their Memoranda, the parties dispute the appropriate standard for the Court to apply when conducting its summary judgment analysis. It is axiomatic, however, that the federal standard set forth herein applies to litigation in federal court.

more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff"). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ...'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2726.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also, L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.*, 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909,

915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ...."), *cert. denied*, 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III. *Analysis*

 The only federal claim alleged in Sampson's Complaint is Count VII, which asserts that Scott Anger, Danny O'Malley, Rebecca Grundy, and the City of Xenia have violated 42 U.S.C. § 1983. That statutory provision does not itself create any constitutional rights. Rather, it creates a federal cause of action for "the vindication of constitutional guarantees found elsewhere." *Braley v. City of Pontiac*, 906 F.2d 220, 223 (6th Cir.1990). Thus, in order to succeed on a § 1983 claim, a plaintiff must show: (1) that he was deprived of a right secured by the federal Constitution or laws of the United States; and (2) that he was subjected to this deprivation by a person acting under the color of state law. *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994). In the present case, Sampson's Complaint asserts a § 1983 claim against the individual Defendants, based upon alleged violations of his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. The Complaint also presents a § 1983 claim against the City of Xenia. "A municipality may be held liable under § 1983 if the municipality itself caused a constitutional deprivation. The City of Xenia cannot be held responsible under a theory of *respondeat superior*, however. Sampson must show that the City itself, though a custom or policy, caused the alleged constitutional violation." *Monell v. Dept. of So-*

*cial Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The custom or policy must be the "moving force" behind the constitutional violation. *Id.* at 694, 98 S.Ct. 2018. "[T]o satisfy the *Monell* requirements[,] a plaintiff must 'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner v. Memphis Police Dep't,* 8 F.3d 358, 364 (6th Cir. 1993), quoting *Coogan v. City of Wixom,* 820 F.2d 170, 176 (6th Cir.1987).

■ In response to Sampson's Complaint, the individual Defendants have asserted the defense of qualified immunity. In determining whether a state actor is entitled to qualified immunity, the Court must engage in a two-step inquiry. The Court first must determine whether Sampson has demonstrated the violation of a constitutionally protected right. If so, the Court next must determine whether the right was so "clearly established that a reasonable state actor would have known that his actions violated it." *Brennan v. Township of Northville,* 78 F.3d 1152, 1154 (6th Cir.1996). In the present case, the Court will first address the alleged constitutional deprivations caused by each Defendant and the applicability of the qualified immunity defense.[6] The Court then will consider Sampson's § 1983 claim against the City of Xenia.

## A. *Defendant Danny O'Malley*

■ In his Memorandum opposing summary judgment, Sampson fails to provide any argument in support of his claim that Xenia Police Chief Danny O'Malley violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Moreover, the Court's own review of the

record reveals absolutely no evidence suggesting that O'Malley violated any of Sampson's constitutional rights. It is well settled that a "supervisory employee cannot be held liable under § 1983 for the constitutional torts of those he supervises unless it is shown 'that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.'" *Searcy v. City of Dayton,* 38 F.3d 282, 287 (6th Cir.1994). In the present case, Sampson has not identified, nor has the Court uncovered, even a scintilla of evidence tending to show that O'Malley encouraged or participated in any of the actions underlying Sampson's lawsuit. Accordingly, the Court finds O'Malley entitled to summary judgment on Sampson's § 1983 claim.

## B. *Defendant Rebecca Grundy*

Although Sampson alleges that the "Defendants" collectively violated his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights, the only conceivable violation attributable to Grundy is a deprivation of his right to liberty without due process of law. As Clerk of the Xenia Municipal Court, Grundy had absolutely nothing to do with Sampson's interrogation, arrest, or the conditions of his confinement. Therefore, the Court can envision no circumstances under which Grundy could have violated Sampson's Fourth, Fifth, Sixth, or Eighth Amendment rights. Sampson's only argument with respect to Grundy is that she failed to ensure his release from jail after the Xenia Municipal Court judge dismissed all charges against him. (Doc. # 26, at 14–15). Specifically, he contends she made no attempt to confirm his discharge and "failed to take any action despite seeing his name on a daily jail list no less than 52 times."[7] (*Id.*).

---

6. For the reasons set forth more fully, *infra,* the Court does not reach the second step of the qualified immunity analysis in the present case. Because the Court finds no violation of Sampson's constitutional rights by the Defendants, it need not consider whether the

various rights Sampson asserts were "clearly established" at the time of the purported violations.

7. This allegation misstates Grundy's deposition testimony. Grundy did not testify that

This argument suggests a violation of Sampson's substantive due process rights under the Fourteenth Amendment.[8] *Cf. Armstrong v. Squadrito,* 152 F.3d 564 (7th Cir.1998) (reasoning that a jail inmate who was held for 57 days without receiving a prompt court appearance stated a § 1983 claim against his jailers based upon a deprivation of his substantive due process rights under the Fourteenth Amendment).

After reviewing the record and applicable law, however, the Court finds Grundy entitled to summary judgment, regardless of which constitutional right she allegedly violated. In her deposition, Grundy testified about her role in processing dismissal entries in 1996:

> "Once the dismissals come over [from the prosecutor's office], I pull the case, take them back to the Judge, the Judge signs them, I file stamp them, send a copy over to the jail. Once the jail gets it, it is up to them to make sure that the person is released."

(Grundy depo. at 7). Grundy also explained the court's procedure, at the time of Sampson's incarceration, for sending the signed dismissal entries to the Greene County jail. She testified that after file stamping dismissal entries and entering them in the court's computer, she placed the entries in a pan. (*Id.* at 9). The Municipal Court's bailiffs then hand carried the dismissal entries to the Greene County jail. (*Id.*). Grundy testified that she followed this procedure in Sampson's case, and she could not say whether his

dismissal entry ever reached the jail. (*Id.* at 8, 16). Grundy also admitted that the Xenia Municipal Court had no policy or procedure in place to verify an inmate's release from jail after the dismissal of all charges. (*Id.* at 23).

Notwithstanding these facts, the Court finds Grundy entitled to summary judgment for several reasons. First, the doctrine of absolute quasi-judicial immunity shields Grundy from § 1983 liability for failing to ensure that Sampson's dismissal papers reached the Greene County jail. It is well-established Sixth Circuit law that court clerks and other court employees have absolute immunity against liability for actions arising out of the performance of judicial or quasi judicial functions. *Foster v. Walsh,* 864 F.2d 416, 418 (6th Cir. 1988). "Quasi-judicial immunity extends to those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *Bush v. Rauch,* 38 F.3d 842, 847 (6th Cir.1994). In *Brown v. Glasser,* 869 F.2d 1488, 1989 WL 20614 (6th Cir. Feb.28, 1989), the court found a clerk of courts entitled to quasi-judicial immunity from the plaintiff's claim that she violated his due process rights by not sending him a copy of a court order denying his post-conviction relief petition. In so doing, the Sixth Circuit reasoned: "[P]laintiff failed to state a claim against the clerk because judicial support staff are entitled to quasi-judicial immunity, absent evidence that

she saw Sampson's name on a jail inmate list 52 times. Rather, she testified that everyone in her office *received* a daily list of all jail inmates. (Grundy depo. at 17, 22). She also testified that Sampson's name vanished from the list shortly after his September, 1996, arrest, which suggested that he had been released from jail. (*Id.* at 8). In reality, however, he had been transferred to the Dayton Mental Health Center. (*Id.*). Grundy then testified that Sampson's name reappeared on the jail list in early December, 1996, after he was "booked" back into the jail. (*Id.*). According to Grundy, the fact that the list contained a December, 1996, booking date indicated that Sampson was jailed on a new

charge. (*Id.* at 22). She explained that ordinarily when an inmate leaves the jail, and then is re-incarcerated on the same charge, the original booking date remains on the list. (*Id.* at 8).

8. Sampson's Memorandum opposing summary judgment also suggests that Grundy may have violated his Eighth Amendment rights. This argument necessarily fails "because that amendment applies only to a convicted prisoner rather than a pretrial detainee whose rights receive the protection of due process." *Armstrong v. Squadrito,* 152 F.3d 564, 570 (7th Cir.1998).

they have acted maliciously or corruptly." Likewise, in *Mwonyonyi v. Gieszl*, 895 F.2d 1414, 1990 WL 10713 (6th Cir. Feb.9, 1990), the Sixth Circuit found a deputy clerk of court entitled to absolute quasi-judicial immunity from § 1983 liability for failing to file a document with the District Court. The *Mwonyonyi* court reasoned that the clerk's duties were related to the District Court's judicial process. *See also Ortman v. State of Michigan*, 16 F.3d 1220, 1994 WL 12230 (6th Cir. Jan.18, 1994) (finding a court clerk entitled to absolute quasi-judicial immunity from liability for allegedly improperly handling the plaintiffs' attempts to appeal); *Sindram v. Suda*, 986 F.2d 1459, 1461 (D.C.Cir.1993) ("[W]e agree with the Sixth Circuit that '[w]hether an act is judicial in character does not depend on whether it is discretionary.' ... Rather, immunity applies to all acts of auxiliary court personnel that are 'basic and integral part[s] of the judicial function,' unless those acts are done 'in the clear absence of all jurisdiction.' ... The acts of the clerks about which Sindram is complaining, ... their '[a]ssistance in preparing and dissemination of' the opinion of one of the defendant judges [is] indisputably [an] 'integral part[ ]' of the judicial process and [is] within their jurisdiction.' "); *Ayers v. Reynolds*, 60 F.3d 830, 1995 WL 386435 (8th Cir. June 30, 1995) ("We agree with the district court that Reynolds was entitled to absolute quasi-judicial immunity for her failure to timely file the state court judge's order or to transmit the certified record. Filing court orders and preparing and transmitting the certified record are functions closely associated with the judicial process.").

█ Similarly, to the extent that Sampson contends Grundy violated his due process rights by failing to send the judge's dismissal order to the Greene County jail, her dissemination of that ruling constitutes an integral part of the judicial process. *Cf. Brown v. Glasser*, 869 F.2d 1488, 1989 WL 20614 (6th Cir. Feb.28, 1989). Based upon the foregoing authorities, the Court finds Grundy entitled to absolute quasi-judicial immunity from liability for her handling of Sampson's dismissal entry. The record contains no evidence suggesting that she acted maliciously or corruptly.

In any event, even if absolute immunity did not preclude Sampson's § 1983 claim against Grundy, the Court would find her entitled to summary judgment. In reaching this conclusion, the Court finds persuasive the Fifth Circuit's recent decision in *Brooks v. George County*, 84 F.3d 157 (5th Cir.1996). In *Brooks*, the plaintiff sought to hold the clerk of courts and others liable under § 1983 for his eight-month confinement after the dismissal of all charges against him. The facts underlying Brooks' lawsuit are similar to those in the present case:

"... Brooks was incarcerated in the George County jail on January 21, 1991, and was arraigned on the indictments on January 28, 1991. On or about the same day, Gary Evans, assistant district attorney for the Nineteenth Judicial Circuit, requested that the charges against Brooks be dismissed pursuant to a nolle prosequi order. ·An order granting the district attorney's motion was signed on February 4, 1991, in Jackson County, Mississippi, by Judge Clinton E. Lockard. On February 5, 1992, the district attorney's office filed a copy of the order at the George County Circuit Clerk's office. The order was filed the same date by an employee of the circuit clerk of George County. Evans apparently informed Brooks's attorney, William T. Bailey, of the state's intention to seek dismissal prior to making the motion. However, neither the Sheriff's office nor Brooks was notified of the dismissal. Brooks was not released until he discovered and showed the order to Sheriff Howell on October 1, 1991."

*Id.*

Following his release from confinement, Brooks brought a § 1983 action against a number of individuals and entities, alleging

violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, Thirteenth, and Fourteenth Amendments to the United States Constitution. *Id.* Brooks' lawsuit included allegations that the clerk of courts had violated his constitutional rights by: (1) failing to disseminate the trial court's order dismissing the charges against him; and (2) failing to adopt an effective office policy for the dissemination of such orders. *Id.* at 168.

Upon review, the Fifth Circuit found Brooks' arguments unpersuasive, and affirmed the trial court's entry of summary judgment in favor of the clerk. In so doing, the *Brooks* court reasoned:

"Under Mississippi law, the judge is the ultimate authority for the supervision of the court in his jurisdiction. As the Mississippi Supreme Court stated, 'Although the clerk performs the physical act of record keeping, the judge is ultimately responsible for the administration of his court.' *In re Collins,* 524 So.2d 553, 555 (Miss.1987). Only those officials who have 'final policymaking authority' may by their actions subject the government to liability under 42 U.S.C. § 1983. *Bryan Cty.,* 67 F.3d at 1182. Accordingly, [court clerk] Ward cannot be liable for failing to establish a policy of sending orders to parties in a criminal proceeding because he was not the policymaker for the George County Circuit Court System.

"We also note that nowhere has Brooks shown that circuit clerks have an affirmative duty under Mississippi law to provide the sheriffs of the state, or counsel for criminal defendants, or criminal defendants pro se, with copies of

orders or pleadings filed in criminal cases. Nor has Brooks shown an affirmative duty to notify sheriffs, counsel or defendants of the filing and entry of orders and pleadings in criminal cases. The circuit clerks merely have a duty to file and docket all papers filed in each court case.

"Since 'no duty to act existed, the failure to act did not violate the constitution.' *Salas v. Carpenter,* 980 F.2d 299, 307 (5th Cir.1992). While it is unfortunate that Brooks languished in the county jail, we can find no duty violated by the clerk to impose liability for the loss. The district court properly granted summary judgment on this issue."

*Id.* at 168–169. Because the Fifth Circuit determined that the clerk was not a policymaker and did not violate any duty, it found no need to address the immunity issue. *Id.* at 169 n. 20.

■ Similarly, in the present case, the Court notes that the Ohio Revised Code defines the duties of the state's municipal court clerks. In particular, Ohio Rev.Code § 1901.31(E) provides that the clerk of a municipal court "shall prepare and maintain a general index, a docket, and other records that the court, by rule, requires, all of which shall be public records of the court." The statute also obligates the clerk of courts to enter judgments, pleadings, and other filings in the Municipal Court's docket, and to perform all other duties that the judge may prescribe. *Id.* Nothing in § 1901.31(E) imposes upon the clerk a statutory duty to guarantee that a copy of the Municipal Court judge's order reaches the affected party.[9]

9. In his Memorandum opposing summary judgment, Sampson asserts that Grundy has admitted being responsible for ensuring the release of accused felons after the dismissal of all charges against them. (Doc. # 26 at 16). In support of this claim, Sampson cites a portion of Grundy's deposition testimony. After reviewing the cited deposition testimony, the Court finds Sampson's contention meritless. Grundy *did not* admit that she was responsible for guaranteeing the *release* of

felons after the dismissal of all charges against them. Rather, she simply admitted being responsible for the *preparation* of warrants to discharge. (Grundy depo. at 13).

Moreover, the Court notes that the Clerk's office did not prepare warrants to discharge for individuals being held on felony charges. (*Id.* at 14). In her deposition, Grundy plainly testified that the Xenia Municipal Court used warrants to discharge only for misdemeanor offenses. (*Id.*). The Xenia Municipal Court

Moreover, Grundy testified that she complied with the then-existing office policy of the Xenia Municipal Court. She pulled Sampson's file and provided the judge with the dismissal papers from the prosecutor. After the judge signed the dismissal entry, Grundy file stamped it, entered the information into the court's computer, and placed the signed, stamped entry in a basket. Pursuant to the then-existing office policy of the Xenia Municipal Court, Grundy's role in the process ended once she placed the entry in the basket. The court's bailiffs were responsible for hand-delivering the signed dismissal entry to the Greene County jail. Although neither the Greene County jail nor the Xenia Municipal Court can account for the missing entry, the record is devoid of evidence suggesting that Grundy inadequately performed her job.

Furthermore, the Court notes that the Xenia Municipal Court judge is the final authority for establishing the procedures to be followed by Grundy and her co-workers and the job responsibilities to be performed by each employee. *State ex rel. Cist v. City of Cincinnati,* 102 Ohio St. 692, 135 N.E. 974 (1921) (recognizing that a municipal court clerk "occupies a mere clerical position under rules prescribed by the judges"); Ohio Att. Gen. Opinion No. 81–020 (April 20, 1981) (noting that a municipal court judge is "granted broad discretion in assigning duties to the clerk"); Ohio Rev.Code § 1901.14(A)(3) (providing that municipal court judges have the power "[t]o adopt, publish, and revise rules regulating the administration of the court"). Consequently, to the extent that Sampson contends the Xenia Municipal Court maintained an unconstitutional policy or custom of failing to ensure inmates'

release from confinement, the Municipal Court judge, rather than Grundy, was the final decisionmaker with respect to the challenged practice.[10]

In short, the record reveals: (1) that Grundy enjoys absolute quasi-judicial immunity; (2) that Grundy had no statutorily imposed obligation to ensure that the Greene County jail received Sampson's dismissal papers; (3) that Grundy's handling of the dismissal order complied with the then-existing office policy of the Xenia Municipal Court; and (4) that any deficiency in the practice, policy, or custom of the Xenia Municipal Court was ultimately attributable to the Xenia Municipal Court judge, not to Grundy. Therefore, as in *Brooks, supra,* the Court perceives no basis for finding Grundy liable under § 1983.

### C. Defendant Scott Anger

Sampson alleges that Xenia Police Detective Scott Anger's actions violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. After reviewing the record and applicable law, however, the Court finds no constitutional violations to support his § 1983 claim against Anger.

 In reaching this conclusion, the Court finds absolutely no merit to Sampson's Eighth Amendment claim. As the Defendants properly note, that Amendment is implicated only after an individual is convicted and incarcerated. It does not apply to pretrial detainees, "whose rights receive the protection of due process." *Armstrong v. Squadrito,* 152 F.3d 564, 570 (7th Cir.1998). The Court also finds meritless Sampson's constitutional claims grounded in the Fifth and Sixth Amend-

---

used a different document, captioned "motion and order," to order the release of inmates being held on felony charges. (*Id.* at 14–16). Grundy explained that "motion and order" documents originated in the prosecutor's office. Grundy's responsibility was to place a motion and order in a pan after the document was signed by the Xenia Municipal Court

judge. (*Id.* at 1–16). The court's bailiffs then were responsible for hand-delivering a motion and order to the Greene County jail. (*Id.* at 16).

10. The Court will address Sampson's "policy or custom" argument more fully in its analysis, *infra,* at p. 841 *et seq.*

ments. Sampson bases these claims on Anger's August 21, 1996, "coercive interrogation without counsel." Notably, the record contains a videotape of this event. After reviewing the videotape in its entirely, the Court finds no basis for Sampson's Fifth or Sixth Amendment claims. To the extent that Sampson suggests Anger violated the Fifth Amendment by failing to inform him of his *Miranda* rights, his argument fails for two reasons. *First,* law enforcement officers must give *Miranda* warnings only to those suspects who are in custody, and Sampson was not in custody on the date in question. *United States v. Peete,* 919 F.2d 1168, 1177 (6th Cir.1990). Sampson voluntarily accompanied Anger to the Xenia Police station, and Anger informed Sampson on more than one occasion that he was free to leave. The videotape of Sampson's interview provides no basis for concluding that a reasonable person in Sampson's position would have believed that he was in custody. It is well settled that an individual is not in custody simply because he is questioned at the police station. *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1977). *Second,* the Court notes that Anger did, in fact, inform Sampson of his *Miranda* rights. Consequently, the Court finds no § 1981 claim based upon a violation of *Miranda.*[11]

Even if *Miranda* warnings are not required, however, a confession cannot be used if it was provided involuntarily. *United States v. Macklin,* 900 F.2d 948, 951 (6th Cir.1990). As a result, Sampson next suggests that Anger violated his Fifth Amendment rights by obtaining a coerced confession. Once again, the Court finds no merit in this contention. In support of his claim, Sampson cites a legal text entitled, *Police Misconduct: Law and Litigation,*

Avery, Rudovsky and Bluhm, Third Edition (1997), § 2.25, for the proposition that "[t]he Fifth and Fourteenth Amendments protect against self-incrimination secured by fear of physical injury, torture, exhaustion, or any other type of undue coercion." Although the Court does not dispute Sampson's statement of law, it finds no evidence that Anger secured his confession though any of these unlawful means.

 To the contrary, the videotape reflects a purely voluntary confession. A confession is involuntary only if "the will of the accused has been overwhelmed by official pressure." *United States v. Wrice,* 954 F.2d 406, 411 (6th Cir.1992), modified on other grounds by *United States v. Gessa,* 971 F.2d 1257 (6th Cir.1992). When determining the voluntariness of a confession, a court must consider the totality of the circumstances, including the age of the accused, his level of education and intelligence, his physical condition and emotional state at the time of the confession, the use of physical punishment, and the duration and location of the questioning. *United States v. Welch,* 36 F.3d 1098, 1994 WL 514522 (6th Cir. Sept.19, 1994), citing *Wrice,* 954 F.2d at 411.

 In the present case, Sampson was nineteen years old at the time of his confession. He had completed approximately eleven years of school, and he appeared to comprehend Anger's questions and the purpose of his interrogation. Sampson had voluntarily accompanied Anger to the Xenia Police station, and Anger offered to take him home on several occasions. Nothing about the two-hour interview suggests that Sampson was disoriented as to time or place. Sampson was not confronted by a phalanx of detectives. Although

11. In an affidavit attached to his Memorandum opposing summary judgment, Sampson now contends that he did not fully understand his *Miranda* rights. (Sampson affidavit, attached to Doc. # 26). Even assuming that this assertion is true, Sampson cannot establish a Fifth Amendment violation because he was not in custody, and Anger had no legal obligation to review Sampson's *Miranda* rights at all. Additionally, based upon the Court's review of the videotaped interview, Sampson objectively appeared capable of understanding his rights, notwithstanding his present claim that he lacked such an understanding.

Sampson appeared somewhat nervous, Anger, who was dressed in plain clothes and did not carry a weapon, was polite and courteous throughout the interview. Anger did not threaten Sampson with physical violence, and Sampson was not denied access to food, drink, or the use of a restroom. Although Anger did promise to make a favorable recommendation to the prosecutor if Sampson would confess, he did not promise Sampson any particular outcome in exchange for a confession. Finally, while Anger did mislead Sampson by exaggerating the evidence against him, "police may use small deceptions while interrogating witnesses." *Welch, supra,* quoting *United States v. Harris,* 914 F.2d 927, 933 (7th Cir.1990). In short, no reasonable trier of fact could find that Anger's interview resulted in a coerced confession in violation of Sampson's Fifth Amendment rights. Construing the evidence and all reasonable inferences in a light most favorable to Sampson, the Court finds no genuine issue of material fact on the issue. As a matter of law, Anger's tactics did not render Sampson's confession involuntary. Accordingly, the Fifth Amendment provides no basis for Sampson's § 1983 claim against Anger.

In opposition to this conclusion, Sampson has provided the Court with an affidavit from his father, Phil Stevens. In his affidavit, Stevens avers that Sampson "lacks the capability to understand, comprehend, and appreciate the significance of a police interrogation and legal proceedings." (Phil Stevens affidavit, attached to Doc. # 26, at ¶ 2). Stevens also avers: "After the first time my son Plaintiff Phillip L. Sampson was interrogated at length by Defendant Detective Anger of the Xenia Police Department, I told Defendant Detective Anger of my son Plaintiff Phillip L. Sampson's learning disabilities and inability to understand, comprehend, and appreciate the significance of a police interrogation and legal proceedings prior to the

second interrogation and subsequent arrest." (*Id.* at ¶ 3).

Both the Sixth Circuit and the United States Supreme Court have recognized, however, that mental disability alone does not render a confession involuntary. "A defendant must also prove coercion, since 'coercive police activity' is a necessary predicate to the finding that a confession is not 'voluntary'...." *United States v. Macklin,* 900 F.2d 948, 951 (6th Cir.1990), quoting *Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Absent evidence that police coerced a confession, it cannot be considered involuntary. *Id.* at 951 (rejecting the District Court's determination that the defendants' confessions were involuntary because they purportedly "could not appreciate the consequences of confessing and could not protect their rights without some assistance from counsel"); *see also United States v. Welch,* 36 F.3d 1098, 1994 WL 514522 (6th Cir. September 19, 1994) ("The mere fact that a defendant suffers from a mental condition that impairs her volitional capacity is insufficient to render a confession constitutionally involuntary."). Even assuming, *arguendo,* as Stevens avers, that Sampson could not completely understand the significance of a police interrogation, the record does not demonstrate a coerced confession. On more than one occasion, Anger informed Sampson that he was free to terminate the interview and return home. Anger also urged Sampson to tell the truth rather than simply to admit participation in crimes that he did not commit. Furthermore, notwithstanding Stevens' conclusory assertion that Sampson suffers from a "learning disability," nothing in the videotape suggests that Sampson, who had completed eleven years of school, was unable to understand the detective's factual questions and respond appropriately. Consequently, even if Stevens did inform Anger about Sampson's learning disability *after* the August 21, 1996, interview, Sampson's confession was voluntary.[12]

---

12. Notably, in his deposition testimony, Stevens explained that he told Anger, after

Sampson's Sixth Amendment claim is equally unavailing. "[A] person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversarial proceedings have been initiated against him." *Kirby v. Illinois,* 406 U.S. 682, 688, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). At the time of Sampson's August 21, 1996, interview with Anger, no adversarial criminal proceedings had been initiated against Sampson. In fact, Sampson was not even arrested until September 13, 1996. (Anger depo. at 59–60). Given these facts, the Court concludes, as a matter of law, that Anger did not violate Sampson's Sixth Amendment right to counsel when he interviewed Sampson and obtained his confession. Accordingly, Sampson cannot state a viable § 1983 claim based upon Anger's violation of his Sixth Amendment rights.

■ The Court also finds no evidence to support Sampson's claim that Anger violated his Fourteenth Amendment substantive due process rights. In reaching this conclusion, the Court recognizes that extended periods of erroneous incarceration may offend substantive due process. *Armstrong v. Squadrito,* 152 F.3d 564 ( 7th Cir.1998). In the present case, however, Anger's involvement with Sampson's confinement ended three days after Sampson's September 13, 1996, arrest.

On September 16, 1996, Anger interviewed Sampson in the Greene County jail. (Anger depo. at 60). During that interview, Anger began to question Sampson's mental capacity and his involvement in the crimes for which he had been charged. (*Id.* at 66–68). Anger then discussed his concerns with the Greene County prosecutor, who agreed to dismiss the charges against Sampson. (*Id.* at 70). The charges were dismissed on September 19, 1996. (*Id.* at Exh. 2). Anger had no involvement with the dismissal entry, and he had no further interaction with Sampson. (*Id.* at 73–74). Given these undisputed facts, no reasonable jury could find that Anger's actions violated Sampson's Fourteenth Amendment substantive due process rights. Anger's only role in Sampson's continued confinement was his successful attempt, within six days of Sampson's arrest, to obtain the dismissal of all charges against Sampson.[13]

■ Finally, the Court concludes that Anger did not violate Sampson's Fourth Amendment rights. In his Memorandum opposing summary judgment, Sampson contends that Anger violated the Fourth Amendment by participating in a false arrest/false imprisonment, and by pursuing a malicious prosecution against him. Sampson then argues that false arrest/false im-

Sampson's confession interview but before his arrest, that Sampson "had just gotten out of the Miami Valley Hospital and that, you know, he's got mental problems and if he gets locked up, he might go back to that state of mind." (Stevens depo. at 45–46). This statement does not suggest that Sampson was incompetent at the time of his interview. Rather, it demonstrates Stevens' fear that Sampson might revert "back to that state of mind." In fact, three days after Sampson's arrest, Anger did begin to question Sampson's mental state and, as a result, he obtained the dismissal of all charges against Sampson.

13. As the Court will explain in its analysis, *infra,* Sampson's arrest and incarceration also did not violate his Fourth Amendment rights. Given that Anger is not liable for any Fourth Amendment violation, it would defy logic to

find him responsible for any subsequent Fourteenth Amendment violation arising out of Sampson's continued confinement, particularly when he had no additional contact with Sampson other than the interview three days after Sampson's incarceration. Significantly, Anger *was not* involved with the preparation, filing, or processing of the Xenia Municipal Court entry dismissing Sampson's case.

Furthermore, in his effort to secure Sampson's release, Anger discussed his concerns with the Greene County prosecuting attorney and obtained the dismissal of all charges against Sampson. Given these actions, Anger appears to have done all that reasonably could be expected to secure Sampson's release. Consequently, for the reasons set forth more fully, *infra,* the Court concludes that Anger's conduct did not violate substantive due process as a matter of law.

prisonment and malicious prosecution claims are cognizable under § 1983 as Fourth Amendment violations. The Court finds Sampson's argument unpersuasive. Under Ohio law, "[t]he existence of a reasonable basis to believe that a crime has been committed is sufficient to defeat claims of false arrest and malicious prosecution." *Hansen v. Westerville City School Dist. Bd. of Educ.*, 43 F.3d 1472, 1994 WL 622153 (6th Cir. Nov.7, 1994); *see also Smith v. Thornburg*, 136 F.3d 1070, 1076–1077 (6th Cir.1998) (same result under Tennessee law). "The issue is not whether a crime was actually committed, but whether a reasonable basis existed for believing the accused guilty of the crime." *Id.* Furthermore, if a plaintiff cannot establish a claim for false arrest or malicious prosecution under Ohio law, then he cannot maintain an actionable § 1983 claim on those grounds.[14] *Id.*

In the present case, the Defendants contend that Sampson was arrested pursuant to a valid warrant supported by probable cause. They also stress that Sampson admitted engaging in conduct that constitutes criminal breaking and entering in violation of Ohio law. Additionally, they note that Anger consulted with the Greene County prosecutor before Sampson's arrest, and that the prosecutor expressed his belief that probable cause existed. Finally, the Defendants note that the Greene County prosecutor and the deputy clerk of the Xenia Municipal Court both reviewed and approved a written "Complaint and Affidavit" that Anger signed prior to Sampson's arrest. In response, Sampson stresses: (1) that no Xenia Municipal Court judge made a determination of probable cause; (2) that no Greene County prosecutor's office representative ever averred that probable cause existed; and (3) that the only incriminating evidence against him was his "extremely unreliable admission."[15] (Doc. # 26 at 11).

■ After reviewing the record and applicable law, the Court finds Anger entitled to summary judgment to the extent that Sampson alleges a § 1983 claim against him predicated upon a Fourth Amendment violation. In reaching this conclusion, the Court finds immaterial Sampson's observation that no Xenia Municipal Court judge made a probable cause determination. Under Ohio law, a clerk of courts or a deputy clerk of courts may make a probable cause determination and issue an arrest warrant. *Shadwick v. City of Tampa*, 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972); *State v. Fairbanks*, 32 Ohio St.2d 34, 289 N.E.2d 352 (1972); *State v. Townsend*, App. No. 1618, 1990 WL 138472 (4th Dist. Sept. 14, 1990); *City of Niles v. Nixon*, App. No. 3214, 1983 WL 6180 (11th Dist. June 30, 1983); Ohio R.Crim.P. 4(A). In the present case, Anger's Complaint and Affidavit were signed as "seen and approved" by a Xenia Municipal Court Deputy Clerk. (Anger depo. at Exh. 1). The Defendants claim this document establishes that Sampson was arrested pursuant to a valid warrant issued upon probable cause.

The Court finds this argument unpersuasive. Even assuming that the Deputy Clerk's signature on the document can be

14. This conclusion also applies to claims of false imprisonment. The existence of probable cause precludes a Fourth Amendment claim alleging false imprisonment. *Smith v. Thornburg*, 136 F.3d 1070, 1077 n. 9 (6th Cir.1998).

15. Sampson also argues that the existence of probable cause is necessarily a jury question in § 1983 actions and, therefore, that summary judgment is inappropriate. In *Yancey v. Carroll County, Kentucky*, 876 F.2d 1238 (6th Cir.1989), however, the Sixth Circuit recognized that a District Court may enter summary judgment on the probable cause issue in § 1983 actions when only one reasonable conclusion can be drawn from the evidence. *See also Richardson v. City of Dayton*, 948 F.2d 1290, 1991 WL 243562 (6th Cir. Nov.21, 1991) (recognizing that a District Court may resolve the probable cause issue on summary judgment). As the Court will explain, *infra*, only one reasonable conclusion can be drawn in the present case, and that conclusion is adverse to Sampson.

construed as a judicial finding of probable cause, and that the document can be construed as an arrest warrant, the document itself is facially insufficient to establish probable cause for Sampson's arrest. The Complaint and Affidavit allege five counts of breaking and entering by reciting little more than the applicable statutory language.[16] Although this "bare bones" language is sufficient to state an offense under Ohio R.Crim.P. 3, it has been found inadequate to support a finding of probable cause for purposes of Criminal Rule 4(A)(1), particularly when it does not identify the affiant's basis of knowledge. *Cf. Whiteley v. Warden, Wyoming State Penitentiary,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) (finding a complaint which stated that the defendant and another did unlawfully break and enter into a particular locked and sealed building insufficient to establish probable cause to support the issuance of an arrest warrant, even though the complaint was signed by a sheriff); *State v. White–Barnes,* App. No. 1841, 1992 WL 368844 (4th Dist. Dec. 8, 1992) ("Obviously a complaint alleging an offense by stating the statutory language is not sufficient to serve as the sole basis for the issuance of an arrest warrant"); *State v. Kahn,* Nos. C–800122, C–800126, 1981 WL 9759 (1st Dist. April 29, 1981) (recognizing that "a complaint charging an offense in summary language is constitutionally invalid when it contains no affirmative statement that the complaining officer had personal knowledge of the facts constituting the offense and does not indicate the source of the officer's information or its reliability"). Complaints that allege the requisite statutory elements and include a "bare bones" recitation of facts are sufficient to establish probable cause only if they indicate a source or basis for the complainant's beliefs. The complaint need not be based upon personal knowledge in order to establish probable cause, but the complainant's basis of knowledge must be apparent on the face of the complaint. *City of Dayton v. Perkins,* App. Nos. 7688, 7849, 1983 WL 4806 (2nd Dist. Feb. 9,1983) (finding no probable cause because the complaint consisted of "nothing more than the complainant's conclusion that the individuals named in the complaint committed the offenses set forth in the complaint," without setting forth that the information was based upon personal knowledge, knowledge obtained from other officers, or knowledge obtained from a citizen or informant). In the present case, Anger's Complaint and Affidavit allege that Sampson engaged in breaking and entering at various locations, but it provides no basis for Anger's assertions. Significantly, Anger's Complaint and Affidavit do not state that his factual allegations are based upon a confession obtained from Sampson. Absent some identifiable basis for Anger's belief that Sampson had engaged in unlawful breaking and entering, the Complaint and Affidavit are insufficient to establish probable cause. *Cf. United States v. Fachini,* 466 F.2d 53, 56 (6th Cir.1972) (noting that a complaint must provide an affiant's answer to the hypothetical question, "What makes you think that the defendant committed the offense charged?").

█ The foregoing conclusion does not *ipso facto* establish a Fourth Amendment violation. Although Sampson may not have been arrested pursuant to a valid warrant, the Court is convinced that probable cause existed at the time of his arrest.

---

**16.** Count I, which is representative of the other four Counts, states:

"BEFORE ME, Dayna R. Greene, Deputy Clerk of the Xenia Municipal Court personally came Det. S. Anger, Xenia Police Department, who being duly sworn states that PHILLIP L. SAMPSON at Greene County, Ohio, on or about August 1, 1996, did, by force, stealth, or deception, trespass in an unoccupied structure, to wit: 95 Hill Street, Xenia, Ohio, with purpose to commit therein any theft offense as defined in Section 2913.01 of the Revised Code, contrary to and in violation of Ohio Revised Code Section 2911.13(A), and against the peace and dignity of the State of Ohio. (Breaking and Entering, a felony of the fifth degree)."
(Anger depo. at Exh. 1).

Under § 1983, a claim for an unconstitutional seizure in violation of the Fourth Amendment "exists when the seizure takes place in the absence of probable cause." *Richardson v. City of Dayton,* 948 F.2d 1290, 1991 WL 243562 (6th Cir. Nov.21, 1991). "[A]rrest without a warrant does not violate the Fourth Amendment if probable cause exists...." *Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir.1988). Absent a valid warrant, "[t]he question becomes, viewing the facts in a light most favorable to [the defendant], whether the arresting officers were justified in their belief that [the defendant] had probably committed or was committing a crime." *Id.* at 262. "Probable cause only requires some probability of criminal activity not some type of prima facie showing." *Id.*

In the present case, Sampson's confession during his August 21, 1996, interview with Anger was sufficient to establish probable cause for his arrest.[17] Sampson admitted his participation in breaking and entering activity, he identified other participants in the crimes, and he mentioned observing a friend steal tools from an area business. Although Sampson now contends his confession was "coerced," as noted above, the videotape of Anger's questioning does not support this claim. Based upon the contents of the videotape, no reasonable trier of fact could conclude that Anger lacked probable cause for Sampson's arrest.[18] Viewing the facts and circumstances in a light most favorable to Sampson, Anger was justified in his belief, at the time of the arrest, that Sampson probably had committed a crime.[19] *Cf.*

17. Parenthetically, the Court notes that Sampson discusses the August 21, 1996, interview in an affidavit attached to his Memorandum opposing summary judgment. One portion of that affidavit warrants a brief discussion. Specifically, in paragraph six of his affidavit, Sampson refers to his videotaped deposition and states: "In fact, the videotape shows a portion of the interrogation when Officer Scott Anger leaves the room and I was alone, and not realizing that the interrogation was being taped, the tape shows that I was speaking to myself and wondering aloud why I was being questioned because I had done nothing wrong." (Sampson affidavit at ¶ 6, attached to Doc. # 26). The Court's own review of the videotape reveals that Sampson did speak to himself while alone in the room. Furthermore, he did appear to question Anger's inquiries. Significantly, however, Sampson has presented the Court with absolutely no evidence suggesting that Anger viewed the videotape before seeking his arrest. To the extent that Sampson's actions and comments while alone in the room might be exculpatory, they do not diminish the existence of probable cause absent some evidence that Anger reviewed the tape. Because Sampson was alone in the room at the time in question, the Court finds no basis for attributing knowledge of Sampson's statements to Anger.

18. In addition to the admissions set forth above, Sampson made a number of other statements during his taped interview. Some of these other statements provide additional support for the Court's conclusion that Anger possessed probable cause to believe Sampson

had engaged in criminal activity. For example, after denying his involvement in any illegal breaking and entering activity, Sampson admitted, on three different occasions, that he "probably" would "fail" if Anger asked him the same questions while administering a polygraph test. Sampson also recalled that an alarm sounded when he kicked the door at one area business. He told Anger that this incident occurred between 1:30 a.m. and 2:00 a.m. Additionally, Sampson admitted to Anger that sockets, screwdrivers, and wrenches were stolen from Xenia Transmission, an area business. Although Sampson denied personally removing the tools, he told Anger that Xenia Transmission was the only place he ever "did" with his friends. The Court also notes that Sampson's demeanor reasonably could have caused Anger to believe Sampson had participated in some criminal activity. Sampson sometimes answered the detective's questions without hesitation. When asked about his involvement in particular criminal activity, however, Sampson often hesitated, avoided eye contact and shifted uneasily in his chair. In short, after reviewing the tape thoroughly, the Court is convinced, as a matter of law, that Anger possessed probable cause to believe Sampson had engaged in criminal activity. As a result, Anger did not violate Sampson's Fourth Amendment rights, as a matter of law.

19. Although Anger subsequently began to doubt Sampson's guilt after re-interviewing him in the Greene County jail, this fact does not negate the existence of probable cause *at*

*Vermilyea v. City of Northwood,* 114 F.3d 1190, 1997 WL 312018 (6th Cir. June 10, 1997) (affirming the District Court's entry of summary judgment, finding no Fourth Amendment violation and no § 1983 claim when an officer arrests a suspect without a valid warrant but with probable cause).

### D. *City of Xenia's Liability under § 1983*

■ The Court may easily dispose of Sampson's § 1983 claim against the City of Xenia. As set forth above, § 1983 does not impose vicarious liability on a municipality for the constitutional torts of its employees. *Stemler v. City of Florence,* 126 F.3d 856, 865 (6th Cir.1997). A municipality may be held liable, however, when its own unconstitutional policy or custom causes a plaintiff's injury. *Id.*

In the present case, Sampson attempts to hold the City of Xenia liable under § 1983 based upon the Xenia Municipal Court's lack of an adequate "policy or procedure" to ensure his timely release from the Greene County jail. In particular, Sampson argues that the Municipal Court's inadequate policies and procedures caused him to remain in jail long after the dismissal of all charges against him. (Memorandum Contra Summary Judgment, Doc. # 26 at 18). Unfortunately for Sampson, however, his § 1983 claim against the City of Xenia fails as a matter of law, regardless of any perceived or actual deficiencies in the Xenia Municipal Court's procedure for entering dismissal orders and notifying the Greene County jail.

The fatal flaw in Sampson's argument is that the City of Xenia does not establish the "policies" or "customs" of the Xenia Municipal Court. The Sixth Circuit has recognized that Ohio's municipal courts are separate and distinct from the municipal corporations in which they sit. In *Manci-*

ni *v. City of Garfield Heights,* 37 F.3d 1499, 1994 WL 548830 (6th Cir. Oct.6, 1994), the court determined that an Ohio municipality cannot be liable for the acts of Ohio municipal court employees, "because municipal courts are part of the state court system and are not subject to the supervision of municipal governments." Likewise, in *Foster v. Walsh,* 864 F.2d 416 (6th Cir.1988), the court reasoned:

"It cannot seriously be argued that an Ohio municipal court is indistinguishable from the municipal corporation in which it sits. The Akron Municipal Court is part of the Ohio state court system, established by the Ohio state legislature. Ohio Rev.Code § 1901.01. It is subject to the supervision of the Ohio Supreme Court. Ohio Const., Art. IV, § 5. The municipal court may not be abolished by the city council, nor may the council expand or restrict the court's jurisdiction.... The territorial jurisdiction of the Akron Municipal Court is not coextensive with the city limits of Akron. Ohio Rev.Code § 1901.02(B). The employees of the Akron Municipal Court are not city employees subject to the authority of the Akron Civil Service Commission...."

*Id.* at 418–419; *see also Mace v. City of Akron,* 989 F.Supp. 949, 956–957 (N.D.Ohio 1998) (recognizing that "municipal courts, not municipalities, retain the authority to make policy decisions concerning court employees"). The Sixth Circuit recently reiterated that state municipal and common pleas courts are components of the state government and not part of the county or municipal government where they sit. *Mumford v. Basinski,* 105 F.3d 264, 268–270 (6th Cir.1997). Given the Sixth Circuit's recognition that Ohio's municipal courts are separate and distinct from the municipality in which they sit, and that municipal courts are not subject

---

the time of the arrest. "The Constitution does not guarantee that only the guilty will be arrested." *Criss v. City of Kent,* 867 F.2d 259, 263 (6th Cir.1988). Moreover, the Court

notes that Anger secured the dismissal of all charges against Sampson immediately after beginning to question Sampson's involvement in the crimes and his mental capacity.

to the control of local municipal governments, the Court concludes that the City of Xenia cannot be liable under § 1983, as a matter of law, for any allegedly unconstitutional policy or custom of the Xenia Municipal Court.

 Although this conclusion relieves the City of Xenia from potential § 1983 liability, it does not end the Court's inquiry. Notably, Sampson has sued Grundy in her individual and official capacity. A suit against Grundy in her official capacity, however, merely constitutes an action against her employer, the Xenia Municipal Court. *Mumford v. Basinski*, 105 F.3d 264, 270 n. 8 (6th Cir.1997). Unfortunately for Sampson, two well established legal principles preclude him from maintaining a § 1983 action against the Xenia Municipal Court. *First*, the Sixth Circuit has consistently recognized that a state court, unlike a municipality, is not a "person" subject to suit under § 1983. *Id.* at 267 ("A state court is not a 'person' for purposes of 42 U.S.C. § 1983 and hence is not subject to a lawsuit under that statute."); *Mumford v. Zieba*, 4 F.3d 429, 435 (6th Cir.1993) (recognizing that a § 1983 action cannot be maintained against a state court because it "is not a 'person' within the meaning of that term as used in § 1983"); *Foster v. Walsh*, 864 F.2d 416, 418 (6th Cir.1988) (reasoning that a municipal court is not a "person" within the meaning of § 1983, and that a civil rights action cannot be maintained against it). *Second*, the Eleventh Amendment to the United States Constitution bars Sampson from maintaining a lawsuit against the Xenia Municipal Court, because the Court is an arm of the state.[20] *Mumford v. Basinski*, 105 F.3d at 267; *Franceschi v. Schwartz*, 57 F.3d 828, 831 (9th Cir.1995). For the foregoing reasons, the Court concludes that the City of Xenia and the Xenia Municipal Court are entitled to summary judgment on Sampson's 42 U.S.C. § 1983 claim against them.[21]

## IV. Sampson's State–Law Claims

Having found the Defendants entitled to summary judgment on Sampson's § 1983 claim (Count VII), which is the only federal claim in his Complaint, the Court, in its discretion, declines to exercise supplemental jurisdiction over Sampson's state-law claims (Counts I, II, III, IV, V, VI, and VIII). It is well settled that a District Court may decline to exercise supplemental jurisdiction over state-law claims once it has dismissed all claims over which it possessed original jurisdiction. *Sagliocco-lo v. Eagle Ins. Co.*, 112 F.3d 226, 233 (6th Cir.1997). Indeed, the Sixth Circuit has recognized that if all federal claims are dismissed before trial, remaining state claims generally should be dismissed. *Id.*; *Taylor v. First of Am. Bank–Wayne*, 973 F.2d 1284, 1287 (6th Cir.1992). Consequently, the Plaintiff's state-law claims are hereby remanded to the Court of Common Pleas for Greene County, Ohio, from which they were removed by the Defendants.[22]

---

**20.** As a result, even if the Court agreed with Sampson's argument that the Xenia Municipal Court maintained an unconstitutional "policy or custom" regarding the release of jail inmates, and even if that policy or custom easily could have been corrected, the Eleventh Amendment stands as an absolute barrier precluding Sampson's recovery against the Xenia Municipal Court.

**21.** In finding each Defendant entitled to summary judgment on Sampson's § 1983 claim, the Court does not intend to suggest that it condones his tragic confinement for more than three months following the dismissal of his case. To the contrary, Sampson's improper detention "shocks the conscience" of this Court. Nothing done by *these* Defendants, however, shocks the Court's conscience or otherwise constitutes a violation of Sampson's constitutional rights.

**22.** Given the Court's decision to remand Sampson's state-law claims to the Court of Common Pleas for Greene County, Ohio, it has not addressed: (1) the Defendants' potential statutory immunity from liability for Sampson's state common law and statutory claims; or (2) the potential availability of punitive damages for any state-law violations. Having exercised its discretion to remand Sampson's state-law claims, the Court need not reach these issues.

V. *Defendants' Motion to Strike (Doc. # 30)*

Finally, the Defendants seek to strike portions of two affidavits attached to Sampson's Memorandum opposing summary judgment. In the first affidavit, Phil Stevens, Sampson's father, avers in relevant part:

"After the first time my son Plaintiff Phillip L. Sampson was interrogated at length by Defendant Detective Anger of the Xenia Police Department, I told Defendant Detective Anger of my son Plaintiff Phillip L. Sampson's learning disabilities and inability to understand, comprehend, and appreciate the significance of a police interrogation and legal proceedings prior to the second interrogation and subsequent arrest."

(Stevens affidavit at ¶ 3, attached to Doc. # 26). In the other affidavit, Plaintiff Phillip Sampson avers in relevant part that he "did not fully understand" the *Miranda* rights explained to him by Anger during the August 21, 1996, interview in which he confessed. (Sampson affidavit at ¶ 6, attached to Doc. # 26).

The Defendants argue that Stevens' affidavit must be stricken because it contradicts his deposition testimony, and because it contains expert opinion testimony which Stevens is not competent to provide. (Doc. # 30 at 3–5). The Defendants also insist that Sampson's affidavit must be stricken because "[i]f plaintiff is competent to understand his affidavit, he must [have been] competent to understand and consent to the rights explained to him by Detective Anger." (*Id.* at 5). Consequently, the Defendants argue that the two affidavits must be stricken.

In its analysis, *supra,* the Court has found the Defendants entitled to summary judgment on Sampson's § 1983 claim, even taking into account the information contained in the two affidavits. Consequently, as a practical matter, the Court could overrule the Defendants' Motion to Strike, as moot. The Court notes, however, that

Stevens' affidavit does not contradict his deposition testimony. In his deposition, Stevens testified about telling Anger that Sampson had been in the Miami Valley Hospital. (Stevens depo. at 45–46). In his affidavit, Stevens mentioned telling Anger that Sampson had a learning disability, and that he (Sampson) could not understand the significance of a police interrogation or legal proceeding. These two statements do not contradict one another. Stevens' affidavit is more complete, but his deposition testimony does not state that he *only* told Anger about Sampson's visit to the Miami Valley Hospital.

Furthermore, the portion of Stevens' affidavit quoted above is not improper expert opinion testimony. Stevens averred that he told Anger about Sampson having a learning disability and being unable to understand the significance of a legal proceeding. The apparent purpose of this averment is to challenge the propriety of Anger basing his probable cause determination solely upon Sampson's confession. Thus, to the extent the statement is used to show Anger's *awareness* of Sampson's *purported* mental condition, the statement is not improper expert opinion testimony. Consequently, the Court overrules the Defendants' Motion to Strike, insofar as it relates to Stevens' affidavit.

The Court also finds Sampson's affidavit admissible. In his affidavit, Sampson averred that he did not fully understand his *Miranda* rights. In their Motion to Strike, the Defendants insist that "[i]f plaintiff is competent to understand his affidavit, he must [have been] competent to understand and consent to the rights explained to him by Detective Anger." (*Id.* at 5). This argument erroneously assumes that if Sampson was unable to understand his rights in August, 1996, then he must have been incompetent in August, 1998, when he signed his affidavit. The Court finds no basis for concluding, however, that Sampson's level of understanding could not have improved from 1996 to

1998. Accordingly, the Defendants' Motion to Strike (Doc. # 30) is overruled.

## VI. *Conclusion*

Based upon the analysis set forth above, the Defendants' Motion for Summary Judgment (Doc. # 21) is SUSTAINED, insofar as it is directed toward the 42 U.S.C. § 1983 claim (Count VII) in the Plaintiff's Complaint. The Court, in its discretion, declines to exercise supplemental jurisdiction over the remaining claims in the Plaintiff's Complaint, which alleges only state-law violations. Those state-law claims (Counts I, II, III, IV, V, VI, and VIII) are hereby REMANDED to the Common Pleas Court for Greene County, Ohio. The Defendants' Motion to Strike (Doc. # 30) is OVERRULED. The *Defendants* are directed to authenticate the videotape of the Plaintiff's August 21, 1996, interview within seven days, as set forth in footnote two, *supra.*

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.